**2025 WI 26**

# Supreme Court of Wisconsin



WISCONSIN MANUFACTURERS AND COMMERCE, INC., et al.,
*Plaintiffs-Respondents,*

*v.*

WISCONSIN NATURAL RESOURCES BOARD, et al.,
*Defendants-Appellants-Petitioners.*

No. 2022AP718
Decided June 24, 2025

REVIEW of a decision of the Court of Appeals
Waukesha County Circuit Court (Michael O. Bohren, J.)
No. 2021CV342

PROTASIEWICZ, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, C.J., DALLET, HAGEDORN, and KAROFSKY, JJ., joined. HAGEDORN, J., filed a concurring opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, J., joined.

¶1 JANET C. PROTASIEWICZ, J. Wisconsin's Spills Law, WIS. STAT. § 292.01 *et seq.* (2021–22),[1] requires parties responsible for a hazardous substance discharge on their property to notify the Wisconsin Department of Natural Resources immediately. WIS. STAT. § 292.11(2). Then they must initiate "actions necessary to restore the environment to the extent

---

[1] All subsequent references to the Wisconsin Statutes are to the 2021–22 version unless otherwise indicated.

practicable and minimize the harmful effects from the discharge to the air, lands or waters of this state." WIS. STAT. § 292.11(3). The overriding question in this case is whether the DNR[2] must promulgate rules identifying every substance, including its quantity and concentration, that qualifies as a "hazardous substance" under WIS. STAT. § 292.01(5) before responsible parties must comply with the Spills Law. In particular, we must decide whether the DNR must promulgate rules listing PFAS[3] and other emerging contaminants as § 292.01(5) "hazardous substances" before it may apply the Spills Law to them.

¶2     According to the parties, the stakes of our decision are high. The DNR says that if it must promulgate rules identifying each substance, quantity, and concentration that qualifies as "hazardous," it cannot respond to hazardous substance spills in real time as they are occurring. Enforcement of the Spills Law will grind to a halt. During the multi-year rules promulgation process, polluters will have free reign to discharge hazardous substances into air, land, and water, harming human health and the environment in Wisconsin, without any responsibility to begin remediation in the interim.

¶3     Respondents Wisconsin Manufacturers and Commerce, Inc. ("WMC") and Leather Rich, Inc.[4] counter that citizens have a right to know which substances the Spills Law applies to before expending significant time and money remediating a discharge and being subjected to substantial penalties. They highlight the DNR's statements that even everyday substances like milk and beer can, in certain situations, qualify as a "hazardous substance." They argue that the DNR must promulgate rules listing the substances, quantities, and concentrations that satisfy § 292.01(5)'s definition of "hazardous substance" before individuals must comply with the Spills Law. Respondents specifically contend that the

_____

[2] Petitioners Wisconsin Natural Resources Board, Wisconsin Department of Natural Resources, and Steven Little are collectively referred to as "the DNR."

[3] "PFAS" stands for perfluoroalkyl and polyfluoroalkyl substances. They are also known as "forever chemicals." The DNR acknowledges that there are approximately 9,000 PFAS compounds and thousands of PFAS mixtures. Like the parties, we refer to PFAS compounds and mixtures as "PFAS."

[4] Unless otherwise noted, Wisconsin Manufacturers and Commerce, Inc., and Leather Rich, Inc., are collectively referred to as "Respondents."

DNR's application of § 292.01(5) to PFAS and emerging contaminants is an unpromulgated rule, which is invalid and unenforceable under Wisconsin law.

¶4 The parties ask us to decide whether three provisions of Wisconsin's Administrative Procedure and Review Act, WIS. STAT. § 227.01 *et seq.*, require the DNR to promulgate rules before applying the Spills Law in specific situations. First, did WIS. STAT. § 227.01(13) require the DNR to promulgate:

    a. Rules identifying PFAS and other emerging contaminants, including their quantities and concentrations, as "hazardous substances" under § 292.01(5) before it made statements to that effect on its website and in letters to responsible parties;

    b. A rule before issuing an interim decision informing participants in the Spills Law's Voluntary Party Remediation and Exemption from Liability program that it would award only partial liability exemptions, rather than broad liability exemptions, for properties with PFAS discharges; and

    c. Rules imposing a standard or threshold at which individuals must report discharges of PFAS and other emerging contaminants to the DNR before making statements to that effect in a letter to Leather Rich and on its website.

In each instance, we hold that the answer is no.

¶5 Second, does WIS. STAT. § 227.10(1) require the DNR to promulgate rules before stating that emerging contaminants like PFAS satisfy § 292.01(5)'s definition of "hazardous substance." We hold that the answer is no.

¶6 Third, does WIS. STAT. § 227.10(2m) prevent the DNR from enforcing a threshold for reporting a discharge of PFAS or other emerging contaminants. We hold that the answer is no.

¶7      The parties raised these issues in cross-motions for summary judgment.[5] The circuit court granted Respondents' motion and denied the DNR's motion.[6] The court of appeals issued a split opinion affirming the circuit court. Because we reverse the court of appeals and hold for the DNR on all issues, we remand this case to the circuit court with instructions to enter judgment in favor of the DNR.

## I.  THE SPILLS LAW

¶8      An overview of the Spills Law provides context for the parties' dispute. The legislature enacted the Spills Law in 1978 in order to advance "[t]he vitally important work of protecting the life sustaining forces around us, collectively referred to as the environment, [which] is basic and fundamental to our survival." *State v. Mauthe*, 123 Wis. 2d 288, 302, 366 N.W.2d 871 (1985). The Spills Law directly regulates "responsible parties." That is anyone who "possesses or controls a hazardous substance which is discharged or who causes the discharge of a hazardous substance." WIS. STAT. § 292.11(3).

¶9      The Spills Law does not require the DNR to notify responsible parties that they have discharged a hazardous substance. Rather, the Spills Law requires the responsible party to "notify the [DNR] immediately of any discharge" of a hazardous substance. § 292.11(2)(a). Then the responsible party "shall take the actions necessary to restore the environment to the extent practicable and minimize the harmful effects from the discharge to the air, lands or waters of this state." § 292.11(3).

¶10     One way a responsible party may fulfill its statutory obligations under § 292.11(3) is to enter the Spills Law's Voluntary Party Remediation and Exemption from Liability program ("VPLE program") and voluntarily identify and remediate hazardous substances on its property under the DNR's supervision. *See* WIS. STAT. § 292.15. A responsible party who enters the VPLE program is known as a "voluntary party." If the DNR determines that the voluntary party has satisfied the

---

[5] Respondents' argument concerning WIS. STAT. § 227.10(1) has evolved since their circuit court filings. We address it nonetheless.

[6] The DNR also filed a motion to dismiss, which the circuit court denied and the majority of the court of appeals affirmed. The DNR does not seek review of this issue, so we do not address it.

Spills Law's requirements, the DNR has the discretion to award a "certificate of completion" and, as relevant here, one of two types of liability exemptions that it may pass on to future owners of the property.

¶11  The DNR has the discretion to issue a broad liability exemption for hazardous substances that might remain on the property whether or not they were addressed during voluntary remediation. WIS. STAT. § 292.15(2)(a). The DNR may issue a broad liability exemption when it determines that "the environment has been satisfactorily restored to the extent practicable with respect to the discharges and that the harmful effects from the discharges have been minimized." § 292.15(2)(a)3.

¶12  The DNR also has the discretion to issue a partial liability exemption for only specified parts of the property or only the specific hazardous substances that were investigated during voluntary remediation. WIS. STAT. § 292.15(2)(am). The DNR may issue a partial liability when "[p]ublic health, safety or the environment will not be endangered by any hazardous substances remaining on or originating from the property after the partial cleanup." § 292.15(2)(am)1m.a.

¶13  The DNR uses the colloquial term "emerging contaminants" to refer to contaminants that were once unknown, undetectable, or generally considered benign but, due to scientific advances in understanding them, are now considered "hazardous substances." The DNR considers PFAS an "emerging contaminant" and a "hazardous substance." The DNR says that there is now a national scientific consensus that PFAS increases the risk of thyroid disease and some cancers, adversely affects endocrine and reproductive systems, increases cholesterol, and decreases fertility in women, infant birth weights, and human responses to vaccines.

¶14  The DNR also says that during its nearly 50 years administering the Spills Law, it has responded to about 1,000 spills each year, without promulgating rules listing substances, quantities, and concentrations that it deems "hazardous substances" under § 292.01(5). And in that time, the court twice required property owners to remediate hazardous substance discharges despite the lack of DNR rules declaring the contaminants at issue "hazardous substances." *See Mauthe*, 123 Wis. 2d at 290 (discharge of hexavalent chromium); *State v. Chrysler Outboard Corp.*, 219 Wis. 2d 130, 137–38, 580 N.W.2d 203 (1985) (discharge of waste paints, oils, and solvents containing unspecified "hazardous substances").

## II. PROCEDURAL HISTORY

¶15    Leather Rich was a dry cleaner located in Oconomowoc, Wisconsin. In 2018, as Leather Rich's owner prepared to sell the business, she began a site investigation, and discovered that the property was contaminated with volatile organic compounds. Leather Rich voluntarily reported this contamination to the DNR. On January 2, 2019, Leather Rich applied to the VPLE program with the hope of obtaining a certificate of completion with a broad liability exemption.

¶16    Two days later, the DNR published an "Interim Decision on Voluntary Party Liability Exemption (VPLE) Program and Emerging Contaminants" on its website. The DNR stated that due to recent concerns over emerging contaminants, specifically PFAS, it was exercising its authority under § 292.15(2)(am) to offer voluntary parties seeking certificates of completion a partial, rather than a broad, liability exemption. The DNR explained that it was taking this step "to protect public health and safety," but also to "serve as good stewards of state taxpayer dollars." If PFAS contamination were discovered after a voluntary party received a general certificate of completion with a broad liability exemption, then taxpayers, not the property owner, would have to pay for remediation of the threats posed by the PFAS contamination. The DNR assured voluntary parties that the interim decision did "not affect properties that have already received a Certificate of Completion."[7]

¶17    On January 12, 2019, the DNR approved Leather Rich's application to the VPLE program. Leather Rich began conducting a site investigation in accordance with the VLPE program and worked with the DNR for several years. During that time, the DNR sent Leather Rich and other responsible parties letters and posted a page on its website stating that when discharged to the environment, PFAS and other emerging contaminants meet the definition of "hazardous substance" in § 292.01(5).

¶18    On August 24, 2020, Leather Rich sent the DNR a supplemental site investigation work plan showing that it had sampled groundwater wells on its property using two groundwater concentration standards recommended by the Wisconsin Department of Health Services

---

[7] The DNR states that its interim decision is no longer in effect.

("DHS"). The samples revealed two PFAS chemicals in Leather Rich's groundwater: PFOS and PFOA.[8] A table attached to the work plan indicated that concentrations of PFOA in three of the four wells exceeded one or both DHS standards, and concentrations of PFOS in all four wells exceeded both DHS standards.

¶19 On October 28, 2020, the DNR sent a letter that conditionally approved Leather Rich's supplemental site investigation work plan. The letter stated: "In future reports, both the individual and combined exceedances need to be identified for PFAS."

¶20 Shortly after receiving this letter, Leather Rich withdrew from the VPLE program, and Respondents sued the DNR. The parties filed cross-motions for summary judgment. The circuit court granted Respondents' motion, denied the DNR's motion, and held that (1) the DNR's policy of regulating emerging contaminants, including PFAS, as hazardous substances, is an invalid, unpromulgated rule; (2) the DNR's enforcement of a standard or threshold for emerging contaminants, including PFAS, is an invalid, unpromulgated rule; and (3) the DNR's interim decision regarding the VPLE program was an invalid, unpromulgated rule. The DNR appealed. A majority of the court of appeals affirmed the circuit court. We granted the DNR's petition for review raising the issues now before us.

III. ANALYSIS

A.

¶21 We review a circuit court's summary judgment decision de novo "using the same methodology of the circuit court and the court of appeals." *Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶8, 400 Wis. 2d 417, 970 N.W.2d 1. "Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Talley v. Mustafa*, 2018 WI 47, ¶12, 381 Wis. 2d 393, 911 N.W.2d 55 (quoting another source).

---

[8] "PFOA" stands for perfluorooctanoic acid. "PFOS" stands for perfluorooctanesulfonic acid.

¶22 To determine whether either the DNR or Respondents are entitled to judgment as a matter of law, we must interpret several statutes. Statutory interpretation is a question of law that we review independently of the circuit court and court of appeals. *Banuelos v. Univ. of Wis. Hosps. & Clinics Auth.*, 2023 WI 25, ¶13, 406 Wis. 2d 439, 988 N.W.2d 627.

¶23 "We assume that the legislature's intent is expressed in the statutory language." *State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. "[S]tautory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" *Id.*, ¶45 (quoting another source). "[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶46. Where possible, we read statutes "to give reasonable effect to every word, in order to avoid surplusage." *Id*.

B.

¶24 We begin by construing § 292.01(5)'s definition of "hazardous substance" because it informs our analysis of how §§ 227.01(13), 227.10(1), and 227.10(2m) apply to the circumstances at issue. WISCONSIN STAT. § 292.01(5) provides:

> "Hazardous substance" means any substance or combination of substances including any waste of a solid, semisolid, liquid or gaseous form which may cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness or which may pose a substantial present or potential hazard to human health or the environment because of its quantity, concentration or physical, chemical or infectious characteristics. This term includes, but is not limited to, substances which are toxic, corrosive, flammable, irritants, strong sensitizers or explosives as determined by the department.

¶25 Several features of § 292.01(5) are important to this case. The definition of "hazardous substance" is broad and open-ended in that it potentially applies to "any substance or combination of substances." But the definition is limited in that the substance or combination of substances must satisfy one of two fact-specific criteria. A substance or combination

of substances is "hazardous" if, "because of its quantity, concentration, or physical, chemical or infectious characteristics" it: (1) "may cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness;" or (2) "may pose a substantial present or potential hazard to human health or the environment." *Id*.

¶26    In addition, § 292.01(5) provides that the term "hazardous substance" "includes but is not limited to, substances which are toxic, corrosive, flammable, irritants, strong sensitizers or explosives *as determined by the department*." *Id*. (emphasis added). However, the plain text of § 292.01(5) imposes no rulemaking requirement upon the DNR. *See Kalal*, 271 Wis. 2d 633, ¶46 ("In construing or interpreting a statute the court is not at liberty to disregard the plain, clear words of the statute." (quoting another source)). At least 18 provisions in the Spills Law require the DNR to promulgate rules on various subjects.[9] But that requirement is

_____

[9] *See* WIS. STAT. § 292.31(2) (DNR "shall promulgate rules" relating to the investigation and remedial action for properties affected by the discharge of a hazardous substance or environmental pollution); § 292.31(7)(b) (DNR "shall promulgate by rule" criteria for expending certain moneys); § 292.31(7)(c)3. (DNR "shall promulgate rules" establishing criteria for determining certain municipality responsibilities); § 292.55(2) (DNR "shall promulgate rules" for assessment and collection of certain fees); § 292.63(2)(e) (DNR "shall promulgate rules" regarding the discharge of petroleum products); § 292.63(2)(f) (DNR "shall promulgate a rule" establishing a priority system for paying certain awards); § 292.63(2)(h) (DNR "shall promulgate rules" regarding administration of a petroleum remediation program); § 292.63(2)(i) (DNR "shall promulgate rules" relating to evaluating remedial action plans and conducting remedial actions); § 292.63(2)(j) (DNR "shall promulgate rules" regarding petroleum remediation approvals and managing employee compliance); § 292.63(2e)(a) (DNR "shall promulgate rules" relating to a required risk-based analysis); § 292.63(1m) (commissioner of insurance "shall promulgate rules" defining certain liabilities that are excluded from insurance coverage); § 292.63(4)(h)2. (DNR "shall promulgate a rule" identifying certain ineligible costs for certain claims); § 292.63(9)(a) (DNR "shall promulgate rules" prescribing requirements for the maintenance of certain records); § 292.65(3)(a) (DNR "shall promulgate rules" for administering a dry cleaner environmental response program); § 292.65(8)(j)3. (DNR "shall promulgate a rule" regarding certain ineligible costs); § 292.65(12)(a) (DNR "shall promulgate rules" for maintenance of certain records); § 292.68(11) (DNR "shall promulgate rules" specifying procedures relating to certain claims);

conspicuously absent from § 292.01(5). *See Clean Wisconsin, Inc. v. DNR*, 2021 WI 71, ¶28, 398 Wis. 2d 386, 961 N.W.2d 346 (*Clean Wis. I*) (holding that a statute governing groundwater standards did not require rulemaking because it did not say that DNR must "promulgate rules to assure compliance with [the relevant groundwater standards]").

¶27　Respondents argue that § 292.01(5) is ambiguous because it does not list which substances are "hazardous." It uses "inherently ambiguous, judgment-laden terms like 'significantly,' 'serious,' and 'substantial.'" It provides no threshold at which those terms are satisfied. And, while Respondents primarily object to § 292.01(5)'s application to PFAS and other emerging contaminants, they contend that even a mug of beer or a gallon of milk spilled in the yard could satisfy the definition.

¶28　To be ambiguous, the statute must be "capable of being understood by reasonably well-informed persons in two or more senses." *Kalal*, 271 Wis. 2d 633, ¶47. Yet Respondents do not argue that reasonably well-informed persons could understand § 292.01(5) both as applying and as not applying to PFAS and other emerging contaminants. Furthermore, the plain text of the statute defeats their hypothetical examples. It is possible for an every day substance like milk or beer to qualify as a "hazardous substance," but only if it first satisfies § 292.01(5)'s fact-specific criteria. A mug of beer or a gallon of milk spilled into Lake Michigan may not "pose a substantial present or potential hazard to human health or the environment," but a 500-gallon tank of beer or milk discharged into a trout stream might well pose a substantial present hazard to the stream's fish and environment.

¶29　Beyond that, Respondents merely search for ambiguity by highlighting terms they regard as vague and noting the absence of a list of specific substances, quantities, and concentrations meeting § 292.01(5)'s criteria. "Statutory interpretation involves the ascertainment of meaning, not a search for ambiguity." *Kalal*, 271 Wis. 2d 633, ¶47 (quoting another source). If we were to accept Respondents' argument that the legislature's use of terms like "significantly," "serious," and "substantial," without imposing thresholds, renders a statute ambiguous, then scores of

---

§ 292.94 (DNR "shall promulgate rules" relating to fees for certain enforcement actions).

Wisconsin statutes on a wide range of subjects would be called into doubt.[10]

¶30 To summarize, § 292.01(5)'s definition of "hazardous substance" is broad and open-ended in that it could potentially apply to any substance or combination of substances, but it explicitly and unambiguously applies only to substances that satisfy one of § 292.01(5)'s two fact-specific criteria. Furthermore, § 292.01(5) does not require the DNR to promulgate rules identifying substances that qualify as "hazardous substances" before administering the Spills Law.

C.

¶31 The initial question before us is whether WIS. STAT. § 227.01(13) required the DNR to promulgate administrative rules before making three types of communications: (1) stating on its website and in letters to responsible parties that PFAS and other emerging contaminants are "hazardous substances" under § 292.01(5); (2) posting an interim decision to award only partial liability exemptions, instead of broad liability exemptions, to VPLE participants due to PFAS; and (3) sending a letter to Leather Rich and posting on its website an alleged standard or threshold for reporting discharges of PFAS and other emerging contaminants to the DNR.

¶32 Respondents argue that these communications are really administrative rules but the DNR failed to promulgate them as rules. Unpromulgated rules are invalid and unenforceable under WIS. STAT. § 227.40(4)(a). The DNR contends that all of these communications fail to satisfy § 227.01(13)'s criteria for a "rule." Specifically, they lack "the effect of law." We agree. Therefore, we hold that the DNR was not required to promulgate these communications as rules.

---

[10] *See, e.g.*, WIS. STAT. § 94.709(2)(a)1 (statute regarding the use of DDT during a "serious epidemic disease of humans or animals"); § 51.20(1)(a)2.a. (mental commitment statute requiring a "substantial probability of physical harm" as manifested by recent threats or attempts at "serious bodily harm"); § 969.035(1)(a) (bail statute referencing "serious bodily harm" causing "serious permanent disfigurement"); § 450.155(1)(c)3. (statute defining material harmful to minors as lacking "serious literary, artistic, political, or scientific value if, taken as a whole, for minors"); § 70.37(1)(f) (statute governing mining activity that "significantly alters quality of life in [the] communit[y]").

¶33    WISCONSIN STAT. § 227.01(13) defines the term "rule."

"Rule" means a regulation, standard, statement of policy, or general order of general application that has the force of law and that is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency.

¶34    Under § 227.01(13), a rule has five features. It is "(1) a regulation, standard, statement of policy or general order; (2) of general application; (3) having the effect of law; (4) issued by an agency; (5) to implement, interpret or make specific legislation enforced or administered by such agency as to govern the interpretation or procedure of such agency." *Citizens for Sensible Zoning, Inc. v. DNR*, 90 Wis. 2d 804, 814, 280 N.W.2d 702 (1979). The only feature of a rule at issue in this case is the third one—to be a rule, the statement must have the effect of law.

¶35    We recently explained that a guidance document inherently lacks the effect of law. *Serv. Emps. Int'l Union v. Vos*, 2020 WI 67, ¶102, 393 Wis. 2d 38, 946 N.W.2d 35 (*SEIU*). The definition of a "guidance document" appears in § 227.01(3m):

"Guidance document" means, except as provided in par. (b), any . . . communication issued by an agency, including a manual, handbook, directive, or informational bulletin, that does any of the following:

1.  Explains the agency's implementation of a statute or rule enforced or administered by the agency, including the current or proposed operating procedure of the agency.

2.  Provides guidance or advice with respect to how the agency is likely to apply a statute or rule enforced or administered by the agency, if that guidance or advice is likely to apply to a class of persons similarly affected.

¶36    Guidance documents are created and disseminated by the executive branch administrative agencies. They "explain statutes and rules, or provide guidance or advice about how the executive is likely to apply them." *SEIU*, 393 Wis. 2d 38 , ¶106. They "are simply the written

record of the executive's thoughts about the law and its execution." *Id*. But guidance documents "are not the law, they do not have the force or effect of law, and they provide no authority for implementing or enforcing standards or conditions." *Id.*, ¶102. Guidance documents "impose no obligations, set no standards, and bind no one. They are communications *about* the law—they are not the law itself. They communicate intended applications of the law—they are not the actual execution of the law." *Id*.

1.

¶37 First, we consider the DNR's statements on its website and in letters to responsible parties that emerging contaminants such as PFAS are "hazardous substances" under § 292.01(5). We hold that these statements are guidance documents, which do not have the effect of law. The DNR's statements are "communications *about* the law—they are not the law itself." *SEIU*, 393 Wis. 2d 38, ¶102. "[T]hey provide no authority for implementing or enforcing standards or conditions." *Id*. They do not impose any obligation or standard. *See, e.g.*, *Cholvin v. DHFS*, 2008 WI App 127, ¶29, 313 Wis. 2d 749, 758 N.W.2d 118 (holding that an agency's instruction had the effect of law because it imposed a new eligibility standard for Medicaid benefits). The DNR's statements simply provide the public and responsible parties "guidance or advice with respect to how" it "is likely to apply" § 292.01(5). Wis. Stat. § 227.01(3m)(a)2. That is, the DNR intends to apply § 292.01(5) to PFAS and other emerging contaminants.

¶38 The Spills Law directly regulates responsible parties. So, if the DNR offered no guidance on how it intended to apply § 292.01(5), Leather Rich and other responsible parties would still have to determine whether a PFAS discharge on their property qualifies as "hazardous" under § 292.01(5) and, if so, comply with the Spills Law. Otherwise, the DNR could bring an enforcement action, which could result in penalties. In the enforcement action, the DNR could not cite the statements on its website or in its letters as legal authority that PFAS is a "hazardous substance." The DNR would have to prove that PFAS satisfies § 292.01(5)'s criteria. The responsible party could argue that it does not. The court would decide whether the DNR's application of § 292.01(5) was correct. *See, e.g.*, *Barry Laboratories, Inc. v. Wis. State Bd. of Pharmacy*, 26 Wis. 2d 505, 515, 132 N.W.2d 833 (1965) (applying the same rationale with respect to agency explanatory material under Wis. Stat. § 227.01(5)(r)).

¶39    We hold that the DNR's statements on its website and in its letters to responsible parties are "guidance documents" under § 227.01(3m)(a), which do not have the effect of law. Therefore, the DNR was not required to promulgate rules before making these statements.

2.

¶40    Second, we consider the DNR's interim decision to award only partial liability exemptions, instead of broad liability exemptions, to voluntary parties in the VPLE program. We hold that the interim decision was at most a guidance document, which again does not have the effect of law.

¶41    The Voluntary Party Remediation and Exemption from Liability program is, in a word, "voluntary." § 292.15. No responsible party must enter the program. No voluntary party in the VPLE program has a legal right to a certificate of completion or any exemption from liability. The DNR is not obligated to award a certificate of completion. In fact, the legislature explicitly gave the DNR discretion to deny a certificate of completion with either a broad liability exemption or a partial liability exemption if the DNR determines that the statutory requirements for these exemptions are not met. *See* WIS. STAT. § 292.15(2)(a)1.–3.; § 292.15(2)(am)1m.a. Nothing in § 292.15 obligates the DNR to promulgate a rule before exercising this discretion.

¶42    The interim decision simply announced to the public that due to recent concerns over PFAS, the DNR was exercising its discretion under WIS. STAT. § 292.15(2)(am) to offer voluntary parties partial liability exemptions, rather than broad liability exemptions. The interim decision is not "a regulation, standard, statement of policy, or general order" that has "the force of law." § 227.01(13). The interim decision imposed no obligations and set no enforcing standards or conditions. It did not revoke any previously awarded certificates of completion. The interim decision bound no one. Any voluntary party who did not like the interim decision could withdraw from the VPLE program—which is exactly what Leather Rich did. The interim decision only provided "guidance or advice" about how the DNR was "likely to apply" § 292.15(2)(a)1.–3. and § 292.15(2)(am)1m.a., governing broad and partial liability exemptions, to PFAS. § 227.01(3m)(a)2.

¶43    We hold that the interim decision was a "guidance document" under § 227.01(3m)(a), which does not have the effect of law.

Therefore, the DNR was not required to promulgate the interim decision as a rule.

3.

¶44    Third, we consider Respondents' claim that the DNR has imposed a threshold at which PFAS becomes hazardous and must be reported to the DNR. Respondents point to the DNR's statements in a letter to Leather Rich and on its website for proof of this standard or threshold. We hold that neither statement imposes a standard or threshold or has the effect of law.

¶45    The first statement appears in the DNR's October 28, 2020 letter to Leather Rich, while it was still participating in the VPLE program. The letter offered DNR's conditional approval of a supplemental site investigation work plan that Leather Rich had submitted on August 24, 2020. The letter stated: "In future reports, both the individual and combined exceedances need to be identified for PFAS." Leather Rich contends that this DNR statement imposed a threshold for reporting PFAS. The DNR argues that the statement refers to a DHS standard that Leather Rich used to report PFOA and PFOS concentrations in its groundwater wells.

¶46    We hold that the DNR's October 28, 2020 letter directing Leather Rich to report "individual and combined exceedances" for PFAS was not a "regulation, standard, statement of policy, or general order of general application" under § 227.01(13). The DNR's letter only applied to Leather Rich. Leather Rich had submitted a site investigation work plan indicating that concentrations of PFOA and PFOS in the groundwater on its property exceeded DHS standards. As a result, the DNR told Leather Rich to continue reporting these exceedances going forward. An agency decision on "a particular matter as applied to a specific set of facts does not render it a rule or constitute specific adoption of a rule and is not required to be promulgated as a rule." WIS. STAT. § 227.10(1).

¶47    Respondents also point to a page on the DNR's website titled "PFAS Investigation and Cleanup" as evidence that DNR has imposed a reporting standard or threshold for PFAS. On that page, the DNR states:

> In Wisconsin, persons who own properties that are the source of PFAS contamination, or who are responsible for discharges of PFAS to the environment, are responsible for

taking appropriate actions. Those individuals must also immediately notify the state, conduct a site investigation, determine the appropriate clean-up standards for the PFAS compounds in each media impacted (e.g., soil, groundwater, surface water and sediment) and conduct the necessary response actions.

¶48    There is no mention of any reporting standard or threshold in this statement. And, like the other statements we have addressed, this one is also a "guidance document" under § 227.01(3m)(a). It provides individuals with "guidance or advice" about how the DNR is "likely to apply" § 292.01(5)'s definition of "hazardous substance," and it communicates the notification and remediation requirements imposed by § 292.11(2)(a) and § 292.11(3). The statement explains to the public and responsible parties in plain English how the DNR intends to apply the Spills Law.

¶49    We hold that the October 28, 2020 letter to Leather Rich and the DNR's statement on the "PFAS Investigation and Cleanup" page of its website did not impose a standard or threshold for reporting PFAS or other emerging contaminants to the DNR. And the DNR's website statement is another "guidance document" under § 227.01(3m)(a), which does not have the effect of law. Therefore, the DNR was not required to promulgate these communications as rules.

D.

¶50    The next question before us is whether § 227.10(1) requires the DNR to promulgate rules before stating that emerging contaminants like PFAS satisfy § 292.01(5)'s definition of "hazardous substance." WISCONSIN STAT. § 227.10(1) provides in relevant part: "Each agency shall promulgate as a rule each statement of general policy and each interpretation of a statute which it specifically adopts to govern its enforcement or administration of that statute." Respondents argue that § 227.10(1) "requires rulemaking whenever an agency adopts a general policy or statutory interpretation," and the DNR's statements that PFAS and emerging contaminants are "hazardous substances" is a "statement of general policy" or "interpretation of a statute." We disagree.

¶51    Respondents misread § 227.10(1)'s plain text. They ignore the descriptive clause: "which [the agency] specifically adopts to govern its enforcement or administration of that statute." *Id*. That clause must

have meaning. *Kalal*, 271 Wis. 2d 633, ¶46. ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage."). Guidance documents "provide no authority for implementing or enforcing standards or conditions." *SEIU*, 393 Wis. 2d 38, ¶102. By contrast, § 227.10(1) only applies where an agency seeks to "govern its enforcement or administration" of a statute. Thus, by definition, § 227.10(1) does not apply to guidance documents. Because we have held that the DNR's challenged statements are guidance documents, § 227.10(1) does not apply to them either.

¶52     In addition, there is a difference between an agency applying a plain and unambiguous statute and an agency reversing its previous interpretation of an ambiguous statute. *See Schoolway Transp. Co. v. Div. of Motor Vehicles*, 72 Wis. 2d 223, 236–37, 240 N.W.2d 403 (1976); *Lamar Cent. Outdoor, LLC v. Div. of Hearings & Appeals*, 2019 WI 109, ¶24, 389 Wis. 2d 486, 936 N.W.2d 573. The former does not require rulemaking; the latter does.

¶53     *Schoolway* concerned the Department of Transportation's interpretation and application of bus-licensing statutes. The department had misapplied WIS. STAT. § 341.26(2)(d) and (da) to allow certain dual licensing of buses. Later, the department revised its application of the statute to bring its practice "into conformity with the plain meaning of the statute." *Schoolway*, 72 Wis. 2d at 236. At the same time, the department changed its interpretation of § 341.26(2)(h), governing urban mass transportation. Under the department's original interpretation of § 341.26(2)(h), Schoolway could register buses for certain types of work, but under the department's revised interpretation, it could not.

¶54     We explained that "[w]hen a statute is plain and unambiguous, no interpretation is required." *Id*. at 228. We determined that § 341.26(d) and (da) were plain and unambiguous. Accordingly, the department's revised application of these plain and unambiguous statutes was not a "statement of general policy or interpretation of a statute." *Id*. at 236 (applying § 227.01(4) (1973–74), which is now § 227.10(1)). We thus concluded that the department was not required to promulgate its corrected application of § 341.26(d) and (da) as a rule. *Id.*

¶55     Conversely, we determined that the department's changed interpretation of § 341.26(2)(h) stood "in direct contrast to the manner" in which it had previously administered the statute, and it was using the new interpretation to deny Schoolway a license. *Id.* at 237. We held that

this represented "an interpretation of a statute within the meaning of sec. 227.01(4)." *Id*. The department should have promulgated the new interpretation as a rule. And its failure to do so rendered it invalid. *Id*.

¶56    *Lamar* reinforced the distinction we drew in *Schoolway*. In *Lamar*, the Department of Transportation ordered the owner of a billboard that did not conform to law to remove it within 60 days based on WIS. STAT. § 84.30(11). According to the owner, the department had previously interpreted § 84.30(11) as giving owners 60 days to cure nonconformities, but its new interpretation eliminated the cure option. The owner argued that § 227.10(1) required the department to promulgate its new, no-cure interpretation of § 84.30(11) as a rule. The department countered that rulemaking was not necessary under *Schoolway*.

¶57    We reaffirmed that an agency need not promulgate rules before bringing "its practice into conformity with the plain meaning of an unambiguous statute." *Lamar*, 389 Wis. 2d 486, ¶24 (citing *Schoolway*, 72 Wis. 2d at 236). But when an agency changes its interpretation of an ambiguous statute, it is engaging in rulemaking, and it must promulgate a rule to inform those affected by the changed interpretation of the statute. *Id*. (citing *Schoolway*, 72 Wis. 2d at 237). We determined that § 84.30(11) was ambiguous and that the department had adopted conflicting interpretations of it. Thus, § 227.10(1) required the department to promulgate its new, no-cure interpretation of § 84.30(11) as a rule. *Id*., ¶¶38–39.

¶58    In this case, we have already determined that § 292.01(5) is plain and unambiguous. Thus, the DNR's statements are like the application of an unambiguous statute in *Schoolway*. When the DNR stated that PFAS and emerging contaminants are "hazardous substances" under § 292.01(5) it was not "interpreting" the statute. It was applying an unambiguous statute to a new set of facts. Moreover, Respondents do not point to a previous statement where the DNR said that PFAS and emerging contaminants do *not* satisfy § 292.01(5). So the DNR's statements are unlike the reversal of an interpretation in *Schoolway* and *Lamar*. In short, *Schoolway* and *Lamar* provide an additional reason that § 227.10(1) does not require the DNR to promulgate rules listing substances, quantities, and concentrations that it considers "hazardous" under § 292.01(5).

E.

¶59    The final question before us is whether § 227.10(2m) precludes the DNR from enforcing a standard or threshold for reporting a discharge of PFAS and other emerging contaminants. WISCONSIN STAT. § 227.10(2m) provides:

> No agency may implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency, unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated in accordance with this subchapter.

¶60    Respondents claim that the DNR has imposed a reporting or notification threshold for discharges of emerging contaminants, including PFAS, without the "explicit authority" to do so.[11] The DNR denies having established a reporting threshold and argues that even if it had, it has the authority to do so by virtue of § 292.11(2)(a), § 292.01(5), *Clean Wis. I*, and *Clean Wisconsin, Inc. v. DNR*, 2021 WI 72, 398 Wis. 2d 433, 961 N.W.2d 611 (*Clean Wis. II*).

¶61    We recently held that § 227.01(2m)'s terms may be satisfied by "a grant of authority that is explicit but broad." *Clean Wis. I*, 398 Wis. 2d 386, ¶25. We later explained that "for purposes of § 227.10(2m), if the legislature clearly expresses in a statute's text that an agency can undertake certain actions, the breadth of the resulting authority will not defeat the legislature's clear expression." *Clean Wis. II*, 398 Wis. 2d 433, ¶24. In *Clean Wis. II*, we determined that multiple sections of chapter 281 gave the DNR "broad but explicit authority" to consider the potential environmental impact of proposed high capacity wells and impose conditions on permits for them. *Id.*, ¶¶25–26. And we stressed that § 227.10(2m) cannot be read to "strip an agency of the legislatively granted explicit authority it already has." *Id.*, ¶24.

---

[11] Respondents acknowledge that the Spills Law incorporates certain federal notification requirements, and, as a result, the DNR now has explicit authority to enforce reporting thresholds for the PFOA and PFOS found on Leather Rich's property. *See* 40 C.F.R. § 302.4 (2024).

¶62     Under these principles, the Spills Law gives the DNR "broad but explicit authority" to enforce a threshold for reporting a PFAS discharge without promulgating a rule. We have determined that § 292.01(5) is broad in that it potentially applies to "any substance or combination of substances," but it explicitly requires the substances to satisfy fact-specific criteria, including the quantity and concentration at which they become "hazardous" and their physical, chemical, or infectious characteristics. Plus, § 292.01(5) explicitly gives the DNR authority to designate substances "hazardous" by determining that they are "toxic, corrosive, flammable, irritants, strong sensitizers or explosives" without rulemaking. In addition, the Spills Law charges the DNR with ensuring that responsible parties fulfill their statutory duties to investigate and remediate discharges "to restore the environment to the extent practicable" and to "minimize the harmful effects" of it. § 292.11(2)–(3). If they fail to take adequate action, the DNR "may identify, locate, monitor, contain, remove or dispose of the hazardous substance" under § 292.11(7). WISCONSIN STAT. § 227.10(2m) cannot be read to "strip [the DNR] of the legislatively granted explicit authority it already has." *Clean Wis. II*, 398 Wis. 2d 433, ¶24. Accordingly, § 227.10(2m) does not preclude the DNR from enforcing a threshold for reporting discharges of PFAS and other emerging contaminants.

## IV.  CONCLUSION

¶63     Wisconsin's Spills Law safeguards human health and the environment in real time by directly regulating parties responsible for a hazardous substance discharge. Responsible parties must, on their own initiative, immediately report a discharge to the DNR, restore the environment to extent practicable, and minimize the harmful effects on our air, lands, and waters. Neither § 227.01(13) nor § 227.10(1) required the DNR to promulgate rules before issuing the communications about the Spills Law that WMC and Leather Rich challenge. Moreover, as § 227.10(2m) requires, the DNR has explicit authority to enforce a threshold for reporting the discharge of hazardous substances. We therefore reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed, and we remand this case to the circuit court with instructions to enter judgment in favor of the DNR.

BRIAN HAGEDORN, J., concurring.

¶64    In giving voice to the concerns of the regulated community, WMC argues that the public has a right to know if and when they are subject to the Spills Law. In this case, WMC argues that such a right is safeguarded by requiring DNR to promulgate rules when it deems a chemical or substance hazardous. Here, they say, DNR erred when it announced PFAS would be treated as hazardous substances through communications that constituted unpromulgated rules. But as the majority concludes—and I agree—DNR's communications and documents are not rules, but guidance documents. I write separately to note that while guidance documents are not rules, they are not immune from judicial scrutiny.

¶65    The law provides a mechanism for challenging the validity of a guidance document in court via a declaratory judgment action. WIS. STAT. § 227.40(1) (2023–24).[1] And a party need not wait until an enforcement action is commenced; even the threat of enforcement or application of the guidance document can be challenged if it "interferes with or impairs . . . the legal rights and privileges" of the party. *Id.* A guidance document can be declared invalid if it "violates constitutional provisions or exceeds the statutory authority of the agency." § 227.40(4)(a). Thus, guidance documents that indicate how an agency intends to enforce the law—for example, the identification of a new hazardous substance prior to enforcement—are subject to judicial review.

¶66    The statutes as written provide even more avenues for relief. The law states, for example, that guidance documents should go through a notice-and-comment period prior to their adoption. WIS. STAT. § 227.112(1)(a)–(b). If this procedure is not properly complied with, a regulated party can challenge the resulting guidance document and have it declared invalid. § 227.40(4)(a).  Furthermore, if an agency acts "at variance with a position expressed in a guidance document," those who reasonably relied upon the agency's stated views and were affected by the change receive additional procedural protections in agency proceedings. § 227.112(4). In 2020, however, this court narrowly ruled that these and related provisions are facially unconstitutional. *Serv. Emps. Int'l Union, Loc.*

---

[1] All subsequent references to the Wisconsin Statutes are to the 2023–24 version unless otherwise indicated.

*1 v. Vos*, 2020 WI 67, ¶108, 393 Wis. 2d 38, 946 N.W.2d 35 (Kelly, J., majority opinion) (*SIEU*).

¶67 In *SEIU*, the court reasoned that the creation and dissemination of all guidance documents lies within the core powers of the executive branch because they are expressions of executive branch thought, a prerequisite to executing the law. *Id.*, ¶¶105–08. While it may be that some applications of these statutory provisions raise separation of powers concerns, I remain unconvinced that all applications violate the constitution. *See id.*, ¶¶190–213 (Hagedorn, J., concurring in part, dissenting in part). Perhaps factual situations like the one present here might cause this court to reconsider *SEIU*'s more sweeping statements. When DNR wishes to notify the public of its intention to enforce the Spills Law in new ways by identifying new hazardous substances, the legislatively directed notice-and-comment period may be both beneficial and constitutional. The majority in *SEIU* was focused on executive thought; but this case highlights the important role guidance documents can play in notifying the public of new intended applications of the law. It is not so much about executive branch thinking as it is executive branch informing, which may not raise the same constitutional concerns that animated the majority's conclusion in *SEIU*.

¶68 As it stands, WMC's attempt to shoehorn executive communication about how DNR intends to enforce the law into administrative rulemaking is unsuccessful. I therefore join the majority opinion.

REBECCA GRASSL BRADLEY, J., with whom ANNETTE KINGSLAND ZIEGLER, J., joins, dissenting.

¶69     This case is about whether the People are entitled to know what the law requires of them before the government can subject them to the regulatory wringer. The majority leaves the People at the mercy of unelected bureaucrats empowered not only to enforce the rules, but to make them. Americans have lived under this unconstitutional arrangement for decades, but now, the majority says, the bureaucrats can impose rules and penalties on the governed without advance notice, oversight, or deliberation. In doing so, the majority violates three first principles fundamental to preserving the rule of law—and liberty.

¶70     First, the People gave the lawmaking power to the legislature alone. The structural separation of powers embedded in the Wisconsin Constitution "operates in a general way to confine legislative powers to the legislature." *League of Women Voters of Wis. v. Evers*, 2019 WI 75, ¶35, 387 Wis. 2d 511, 536, 929 N.W.2d 209 (quoting *Goodland v. Zimmerman*, 243 Wis. 459, 467, 10 N.W.2d 180 (1943)). Second, the legislature has no authority to delegate its lawmaking power to anyone else. "[W]hen the people have said, we will submit to rules and be governed by laws made by such men, and in such forms, nobody else can say other men shall make laws for them; nor can the people be bound by any laws but such as are enacted by those whom they have chosen and authorized to make laws for them." JOHN LOCKE, THE SECOND TREATISE OF CIVIL GOVERNMENT § 141 (1764), *reprinted in* TWO TREATISES OF GOVERNMENT 119, 193 (Thomas I. Cook ed., 1947). Finally, "[r]udimentary justice requires that those subject to the law must have the means of knowing what it prescribes." Antonin Scalia, *The Rule of Law As A Law of Rules*, 56 U. CHI. L. REV. 1175, 1179 (1989).

¶71     In other cases, I have explained the unconstitutionality of the legislature sub-delegating its lawmaking power to an unaccountable administrative apparatus. *See generally Koschkee v. Taylor*, 2019 WI 76, ¶¶42–57, 387 Wis. 2d 552, 929 N.W.2d 600 (Rebecca Grassl Bradley, J., concurring); *Wis. Legislature v. Palm*, 2020 WI 42, ¶¶66–86, 391 Wis. 2d 497, 942 N.W.2d 900 (Rebecca Grassl Bradley, J., concurring); *Becker v. Dane Cnty*, 2022 WI 63, ¶¶73–149, 403 Wis. 2d 424, 977 N.W.2d 390 (Rebecca Grassl Bradley, J., dissenting). In this case, the majority weakens the guardrails the legislature constructed to check the exercise of delegated lawmaking power by agencies. It's bad enough "[w]hen legislatures

expound broad policy goals and leave the details to administrative bodies,"[1] but when the judiciary allows administrative agencies to impose unpromulgated and costly mandates on Wisconsin citizens and to penalize them for noncompliance, "the consolidation of power within executive branch agencies 'often leaves Americans at their mercy' endowing agencies with 'a nearly freestanding coercive power' and 'the agencies thereby become rulers of a sort unfamiliar in a republic, and the people must jump at their commands.'" *Koschkee*, 387 Wis. 2d 552, ¶45 (Rebecca Grassl Bradley, J., concurring) (quoting PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? 335 (2014)) (cleaned up). These dangers are particularly pronounced when, as the majority opinion now holds, administrative bodies can force people to "jump" without ever saying "how high"—apparently, the People must figure that out for themselves.

¶72 Joanne Kantor owns Leather Rich, Inc., a small, family-owned dry cleaning business she built with her husband, Ron, and operated for more than 40 years. To protect the environment from possible contaminants, the Kantors voluntarily installed an impermeable barrier underneath the building. After Ron died in 2018, Joanne decided to sell the business and retire. Seven years and almost $300,000 later, the government won't let her.

¶73 In preparation for a sale, Joanne hired an environmental consultant to evaluate the property and discovered low-level volatile organic compounds typically found at dry cleaning facilities, which she reported to the Wisconsin Department of Natural Resources (DNR). After the DNR approved Leather Rich's participation in the Voluntary Party Liability Exemption (VPLE) program, Joanne spent nearly three years investigating the property. Upon satisfactory completion of the VPLE program, the DNR would issue Certificates of Completion (COCs) to participants, granting property owners exemptions from liability.

¶74 During Leather Rich's participation in the VPLE program, the DNR proclaimed—for the first time—that PFAS constitute "hazardous substances" within the meaning of WIS. STAT. § 292.01(5). The DNR ordered Joanne to test for such "emerging contaminants" but never clarified which of the 9,000 PFAS compounds or thousands of PFAS mixtures it considers hazardous, or in what concentrations, preventing

---

[1] *Wis. Legislature v. Palm*, 2020 WI 42, ¶79, 391 Wis. 2d 497, 942 N.W.2d 900.

Joanne from completing remediation of the site. The DNR also announced it would no longer issue broad COCs, leaving property owners exposed to liability. In fear of hindering the "vitally important work" of the DNR, majority op., ¶8 (quoting another source), the majority relieves agencies like the DNR of their statutory obligation to promulgate policies by rule, leaving Joanne and other property owners at the mercy of a governmental agency's ever-evolving diktats. What the DNR currently requires of Joanne, or will require in the future, remains unknown to her, as well as other members of the regulated community.

¶75 "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The people consented to being governed under the rule of law, not bureaucratic decree. The "'[f]reedom of men under government' . . . 'is to have a standing rule to live by, common to every one of that society, and made by the *legislative power* erected in it … and not to be subject to the inconstant, uncertain, unknown, arbitrary will of another man.'" *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 72–73 (2015) (Thomas, J., concurring) (quoting JOHN LOCKE, SECOND TREATISE OF CIVIL GOVERNMENT § 22, at 13 (J. Gough ed. 1947)). That "standing rule to live by" must be established as "*declared* and *received laws*, and not by extemporary dictates and undetermined resolutions . . . for all the power the government has . . . ought to be exercised by *established and promulgated laws*; that both the people may know their duty . . . and the rulers too kept within their bounds." JOHN LOCKE, SECOND TREATISE OF GOVERNMENT, § 137, at 72–73 (C.B. Macpherson ed. 1980).

¶76 Given short shrift by the majority, WIS. STAT. § 227.10(1) dictates when an administrative agency like the DNR must promulgate a rule, with exceptions not applicable under the circumstances presented in this case:

> (1) Each agency shall promulgate as a rule each statement of general policy and each interpretation of a statute which it specifically adopts to govern its enforcement or administration of that statute. A statement of policy or an interpretation of a statute made in the decision of a contested case, in a private letter ruling under s. 73.035 or in an agency decision upon or disposition of a particular matter as applied to a specific set of facts does not render it a rule or

constitute specific adoption of a rule and is not required to
be promulgated as a rule.

While Leather Rich's remediation was underway, the DNR announced it
would henceforth consider "emerging contaminants," including PFAS, to
be "hazardous substances" as broadly defined in WIS. STAT. § 292.01(5):

> "Hazardous substance" means any substance or
> combination of substances including any waste of a solid,
> semisolid, liquid or gaseous form which may cause or
> significantly contribute to an increase in mortality or an
> increase in serious irreversible or incapacitating reversible
> illness or which may pose a substantial present or potential
> hazard to human health or the environment because of its
> quantity, concentration or physical, chemical or infectious
> characteristics. This term includes, but is not limited to,
> substances which are toxic, corrosive, flammable, irritants,
> strong sensitizers or explosives as determined by the
> department.

The DNR advised all VPLE participants, including Leather Rich, to test for
and report any "emerging contaminants" (including PFAS) but did not
identify them with any particularity, or the concentrations at which the
DNR would deem them "hazardous substances." The DNR has left
members of the regulated community guessing what is required of them.
At the same time, the DNR decided to withhold issuing COCs with broad
liability protection, and indicated it would issue only partial liability
protection for particular substances. Section 227.10(1) commands the DNR
to promulgate as a rule its new interpretation of "hazardous substances"
to include PFAS, by which the DNR is enforcing Chapter 292.

¶77   The DNR created a policy, adopted an interpretation of a
statute, and imposed standards under which apparently any detectable
level of PFAS would trigger reporting and remediation obligations under
the law. The DNR binds all property owners in Wisconsin to comply and
subjects them to civil penalties if they don't. Specifically, the DNR has: (1)
adopted a binding and categorical interpretation of WIS. STAT. § 292.01(5)
treating "emerging contaminants" like PFAS as "hazardous substances"
and obligating landowners to report and remediate pursuant to WIS. STAT.
§ 292.11(2); (2) implemented a threshold—any detectable presence of
PFAS—by which property owners are subject to regulation; and (3) via an
interim decision, instituted a categorical refusal to issue broad liability

exemptions under the VPLE program for properties with certain emerging contaminants, including PFAS. WISCONSIN STAT. § 227.10 obligates the DNR to promulgate its new policies, statutory interpretations, and standards, adopted by the DNR to govern its enforcement of Chapter 292, as rules pursuant to the procedures set forth in Chapter 227.

¶78 The majority dodges the rule promulgation requirement of WIS. STAT. § 227.10(1) by declaring the DNR's statements on PFAS as mere "guidance" without the force of law. The majority errs. WISCONSIN STAT. § 227.01(13) defines a rule as "a regulation, standard, statement of policy, or general order of general application that has the force of law and that is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency." This court has distilled five elements from that definition: "(1) a regulation, standard, statement of policy or general order; (2) of general application; (3) having the effect of law; (4) issued by an agency; (5) to implement, interpret or make specific legislation enforced or administered by such agency as to govern the interpretation or procedure of such agency." *Citizens for Sensible Zoning, Inc. v. DNR*, 90 Wis. 2d 804, 814, 280 N.W.2d 702 (1979). The dispute in this case centers on whether the DNR's statements have the "force of law." They do.

¶79 "[W]hen an agency, in order to enforce or administer a statute in its purview, adopts its own understanding of that statute, it generally has interpreted the statute thereby satisfying the 'interpret' criterion of rulemaking." *Tavern League of Wis., Inc. v. Palm*, 2021 WI 33, ¶25, 396 Wis. 2d 434, 957 N.W.2d 261 (lead op.) (citing WIS. STAT. § 227.10(1); *Frankenthal v. Wis. Real Est. Brokers' Bd.*, 3 Wis. 2d 249, 253, 89 N.W.2d 825 (1958)). The way an agency characterizes its directive is immaterial in determining whether such an interpretation has the force of law. "An agency action has the 'effect of law' when: 'criminal or civil sanctions can result [from] a violation'; 'licensure can be denied'; or 'the interest of individuals in a class can be legally affected through enforcement of the agency action.'" *Midwest Renewable Energy Ass'n v. Pub. Serv. Comm'n of Wis.*, 2024 WI App 34, ¶71, 412 Wis. 2d 698, 8 N.W.3d 848 (quoting *Cholvin. v. DHFS*, 2008 WI App 127, ¶26, 313 Wis. 2d 749, 758 N.W.2d 118).

¶80 The majority attempts to circumvent WIS. STAT. § 227.10(1)'s requirements by deeming the DNR's statements mere "guidance documents" that do not "govern its enforcement or administration" of a statute. Majority op., ¶¶39, 50–51. In the context of this case, WIS. STAT.

§ 227.01(3m)(a) defines "guidance document" as "any formal or official document or communication issued by an agency . . . that does any of the following: . . . 2. Provides guidance or advice with respect to how the agency is likely to apply a statute or rule enforced or administered by the agency, if that guidance or advice is likely to apply to a class of persons similarly affected." Whether a statement must be promulgated as a rule is a question of substance, not form. While many "rules" provide "guidance" about how agency policy will apply in the future, mere guidance documents do not have the force of law. By newly declaring PFAS "hazardous substances," impairing the interests of property owners in receiving COCs, imposing legal obligations binding the regulated community of property owners whose land contains them, and threatening to penalize those who do not comply, the DNR's statements have the force of law. *See Serv. Emps. Int'l Union, Loc. 1 v. Vos*, 2020 WI 67, ¶102, 393 Wis. 2d 38, 946 N.W.2d 35 (explaining that guidance documents, by contrast, "functionally, and as a matter of law, [] are entirely inert"). Because the DNR did not follow the proper rule promulgation procedures, the rules are invalid.

¶81 The majority also misconstrues two cases, *Lamar Central Outdoor, LLC v. Division of Hearings & Appeals*, 2019 WI 109, 389 Wis. 2d 486, 936 N.W.2d 573, and *Schoolway Transportation Co. v. Division of Motor Vehicles*, 72 Wis. 2d 223, 240 N.W.2d 403 (1976), to support its atextual construction of WIS. STAT. § 227.10(1) as requiring rulemaking only if an agency reverses its previous interpretation of an ambiguous statute but not when an agency applies a plain and unambiguous statute. Majority op., ¶52. The statutory text belies the majority's interpretation: "Each agency shall promulgate as a rule each statement of general policy and each interpretation of a statute which it specifically adopts to govern its enforcement or administration of that statute." Section 227.10(1) does not relieve agencies of their obligation to promulgate a rule when the statute is "plain and unambiguous"—to the contrary, the statute mandates rule promulgation for "each interpretation of a statute" the agency "specifically adopts to govern its enforcement or administration of that statute." When the DNR adopted a new interpretation of a statute subject to its enforcement, under which it recognized a new category of hazardous substances called "emerging contaminants," the law required the DNR to promulgate as a rule its adopted interpretation of the statute by which the DNR will impose legal obligations on regulated entities.

¶82 Regardless, the majority altogether misunderstands the court's holding in *Schoolway*. In that case, the statutes at issue provided

that in order to qualify for a reduced licensing fee, a school bus must be used exclusively for the transportation of students, and if a school bus were used for other purposes—even if it were sometimes used to transport students—it would be subject to higher licensing fees. *Schoolway*, 72 Wis. 2d at 228. The Department of Transportation corrected its contrary interpretation of the statutes, which the court held did not require rulemaking because the statutes plainly prohibited the Department's prior position. *Id.* at 235–36. Because the Department's earlier practice was "prohibited by the clear exclusivity requirements of the school bus licensing provisions . . . no interpretation of [the statute] is necessary" and the "Department's revised application of these statutes serves to bring its practices into conformity with the plain meaning of the statute, a course the Department was obliged to pursue when confronted with its error." *Id*.

¶83    If, in the context of this case, the definition of "hazardous substance" plainly included PFAS, then of course the DNR would not need to promulgate a rule saying so. The definition of "hazardous substance" does not plainly include PFAS; it doesn't mention them at all. WIS. STAT. § 292.01(5). Because the definition of "hazardous substance" is broad, WIS. STAT. § 277.10(1) requires the DNR to promulgate rules whenever it interprets the definition to encompass a substance the statute doesn't explicitly mention.

¶84    The court in *Schoolway* recognized this distinction, which the majority in this case misses and therefore fails to apply. In *Schoolway*, the Department also revised its interpretation of another statute, under which it had permitted the registration of busses for charter and contract work. 72 Wis. 2d at 236–37. Noting the statute did not "specifically exclude busses engaged in charter and contract work" and the Department instead relied on statutory "context" to reach its conclusion, the court deemed the Department's reversal an interpretation of a statute necessitating rule making. *Id.* The court reasoned, "[t]hose who are or will be affected generally by this interpretation should have the opportunity to be informed as to the manner in which the terms of the statute regulating their operations will be applied." *Id*. at 237. Indeed. The majority in this case misses that point altogether. *Schoolway's* holding focuses on the Department's interpretation of a statute to mean something the text does not make manifest; that the Department reversed its prior position was secondary.

¶85    *Lamar* involved an agency's change in its interpretation of a statute, which the court concluded required rule promulgation. 389 Wis. 2d 486, ¶1. In that case, the agency reinterpreted a statute to prohibit "the owner of a roadside sign from remedying a modification that caused the sign to lose its 'legal, nonconforming' status." *Id.* The court noted the agency's change in position arose "from a reevaluation of what the agency believe[d] a particular statute or regulation requires." *Id.*, ¶11. Because the statute did "not provide an immediately obvious answer" as to which interpretation was correct, *Schoolway* did "not provide an exemption from the rulemaking requirement" under WIS. STAT. § 227.10(1). *Id.*, ¶¶34, 38. As in *Schoolway,* nothing in *Lamar* limits its application to circumstances under which an administrative agency flips its position on the interpretation of a statute. The underlying principle in both cases recognizes that WIS. STAT. § 227.10(1) requires rulemaking whenever an agency interprets a statute to mean something the statute does not clearly provide. WIS. STAT. § 227.10(1); *see Tavern League of Wis., Inc.*, 396 Wis. 2d 434, ¶25 (citing *Lamar*, 389 Wis. 2d 486, ¶38) ("Where a statute's mandate is not clear and unambiguous, an agency will need to interpret the statute in order to take action permitted by the statute."). In this case, the DNR reevaluated what substances qualify as hazardous under WIS. STAT. § 292.01(5), deciding PFAS fall under the statutory definition. Because that definition does "not provide an immediately obvious answer," as to whether the DNR's new interpretation is correct, WIS. STAT. § 227.10(1) requires rulemaking before the DNR may enforce it.

¶86    Even if those cases could be construed to add the limiting language the majority reads into WIS. STAT. § 227.10(1), the DNR did in fact shift its position on PFAS, thereby necessitating rule promulgation. The DNR said as much in its letter to VPLE participants, acknowledging that "PFAS have been manufactured and used in a variety of industries since the 1940s," but "ha[ve] not typically been included as part of any environmental investigation or cleanup." Section 227.10(1) requires agencies to promulgate a rule for "*each interpretation* of a statute which it *specifically adopts* to govern its enforcement of administration of that statute." (Emphasis added.) Because the DNR only recently decided PFAS constitute "hazardous substances," the law requires the agency to promulgate a rule before it enforces any requirements under Chapter 292 against the public. Environmental science and public awareness both develop over time, and substances once thought to be harmless may be discovered to be hazardous. The law protects the public and the environment from such substances, but it also entitles the public to notice before the government enforces the law against them.

\* \* \*

¶87 "[T]he faculty and excess of law-making seem to be the diseases to which our governments are most liable." THE FEDERALIST NO. 62, at 417 (James Madison) (J. Cooke ed., 1961). To guard against these diseases, the framers of our constitutions carefully constructed hurdles in the lawmaking process. In sub-delegating its lawmaking power to executive branch agencies, the Wisconsin Legislature followed suit. "While the rulemaking process the law requires . . . may seem cumbersome . . . 'the difficulties of the legislative process were essential to [the constitution's] design, purposefully placed there to ensure that laws would be more likely the product of deliberation than haste; more likely the product of compromise among the many than the will of the few; and more likely to respect minority interests than trample on their rights.'" *Palm*, 391 Wis. 2d 497, ¶83 (Rebecca Grassl Bradley, J., concurring) (quoting NEIL GORSUCH, A REPUBLIC IF YOU CAN KEEP IT 63 (Crown Forum ed., 1st ed. 2019)).

¶88 The majority allows agencies to bypass the law's requirement that agencies promulgate rules whenever they adopt an interpretation of a statute under WIS. STAT. § 227.10(1), enabling the DNR to blindside the regulated community with vague and shifting directives and associated penalties for noncompliance. Permitting such unchecked power to be wielded by bureaucrats is "antithetical to the Founders' vision of our constitutional Republic, in which supreme power is held *by the people* through their elected representatives, and 'the creation of rules of private conduct' is 'an irregular and infrequent occurrence.'" *Koschkee*, 387 Wis. 2d 552, ¶45 (Rebecca Grassl Bradley, J., concurring) (quoting *Ass'n of Am. R.Rs.*, 575 U.S. at 86 (Thomas, J., concurring).

¶89 Even worse than the disease of excessive lawmaking is "[t]he concentration of power within an administrative leviathan" housed in the executive branch. *Koschkee*, 387 Wis. 2d 552, ¶42 (Rebecca Grassl Bradley, J., concurring). The majority's ongoing expansion of executive power makes its loosening of the statutory guardrails around agency action all the more dangerous. William Blackstone—who "profoundly influenced" the Framers' conception of the separation of powers—"defined a tyrannical government as one in which 'the right both of *making* and of *enforcing* the laws, is vested in one and the same man, or one and the same body of men,' for 'wherever these two powers are united together, there

can be no public liberty.'" *Ass'n of Am. R.Rs.*, 575 U.S. at 73–74 (Thomas, J., concurring) (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 142 (1765)). Because the majority's decision in this case imperils the People's liberty, I dissent.